FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

2013 APR 22  P 3: 28

CLERK US DISTRICT COURT
ALEXANDRIA. VIRGINIA

COLORNET PRINTING AND GRAPHICS,
INC.,
a Maryland corporation,

     *Plaintiff,*

     vs.

DAVID O. NESTOR, and
Serve: 9052 Lawyers Road
     Spotsylvania, Virginia 22551

GOOD PRINTERS, INC.
Serve: Michael A. Fornadel, Registered Agent
     Good Printers, Inc.
     213 Dry River Road
     Bridgewater, Virginia 22812

     *Defendants.*

Case No:  *1:13 CV 490*
     *AJT/TCB*
**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, ColorNet Printing and Graphics, Inc. ("ColorNet"), by undersigned counsel, for their Complaint against Defendants David O. Nestor ("Nestor") and Good Printers, Inc. ("Good Printers") (collectively, "Defendants") alleges as follows:

### The Parties

1.    ColorNet is a Maryland corporation, with its principal place of business in Gaithersburg, Maryland. ColorNet is authorized to do business in Virginia, and has an office in Loudoun County, Virginia.

2.    Nestor is an individual, and a resident of Spotsylvania County, Virginia.

3.    Good Printers is a Virginia corporation with its principal place of business in Bridgewater, Virginia.

## Jurisdiction and Venue

4.      This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1332(a), based upon the diversity of citizenship between Plaintiff and Defendants.

5.      The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.      This Court has personal jurisdiction over Nestor because: 1) he is a resident of the Commonwealth of Virginia; 2) pursuant to Va. Code Ann. § 8.01-328.1(A)(1), as the causes of action asserted against him arise from his transaction of business within the Commonwealth of Virginia; and 3) pursuant to Va. Code Ann. § 8.01-328.1(A)(3) as the causes of action asserted against him arise from tortious injury he caused by act or omission in the Commonwealth.

7.      This Court has personal jurisdiction over Good Printers because: 1) Good Printers is a Virginia corporation; 2) pursuant to Va. Code Ann. § 8.01-328.1(A)(1), as the causes of action asserted against it arise from Good Printers' transaction of business within the Commonwealth of Virginia; and 3) pursuant to Va. Code Ann. § 8.01-328.1(A)(3) because the causes of action asserted against it arise from tortious injury Good Printers caused by act or omission in the Commonwealth.

8.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district, and because the Defendants reside in this judicial district.

## ColorNet's Business

9.      ColorNet is a printing company that markets and sells various printing products and services to its customers, including offset printing, digital printing, and bindery services.

10.     In addition, ColorNet markets and provides a wide range of printing-related services to customers, including document design and creation, optical media (CD/DVD) manufacturing, wide format printing, mailing, shipping and fulfillment services.

11.     While ColorNet's primary business is focused in Maryland, Virginia, and D.C., it services clients throughout the United States.

### Good Printers' Business

12.     Good Printers is a direct competitor of ColorNet.

13.     Good Printers provides customers with similar printing products and services as ColorNet.

14.     While, upon information and belief, Good Printers' business (and customers) are primarily located in Virginia, Good Printers has expanded, and is looking to further expand, into the D.C. metropolitan region and nationally.

### ColorNet Hires Nestor

15.     In 2005, ColorNet began negotiations to acquire the assets of Elway, Inc. ("Elway"), a Virginia-based printing business.

16.     At the time of these negotiations, Nestor was a Customer Service Representative for Elway, and had been employed by Elway for three (3) years.

17.     On November 15, 2005, ColorNet formally acquired the assets of Elway, and hired Nestor to work out of ColorNet's Loudoun County, Virginia office.

### Nestor Enters into Confidentiality Agreement with ColorNet

18.     During the closing days of ColorNet's negotiations regarding the purchase of Elway's assets, ColorNet offered to employ seven (7) key Elway employees.  Nestor was one such key employee.

3

19.     ColorNet's employment offer to Nestor, as well as to the other six (6) Elway employees, was contingent upon their execution of ColorNet's standard confidentially agreement.

20.     Two (2) of these employees refused to execute ColorNet's confidentiality agreement and, as a result, were not employed by ColorNet.

21.     On October 28, 2005, Nestor executed the confidentiality agreement attached hereto as Exhibit A (the "Nestor Agreement").

22.     The Nestor Agreement prohibits Nestor from disclosing any of ColorNet's Confidential Information. Ex. A § 1.

23.     In the Nestor Agreement, Confidential Information is expressly defined to include customer lists, customers' names and contact information, customer profiles, account information, information contained in customer files, information provided by customers to ColorNet, and all information regarding contracts with customers, employees, and vendors. Ex. A § 1.

24.     In addition, the Nestor Agreement expressly provides that:

> While employed by ColorNet and, . . . at all times during the one (1) year period immediately following Employee's Termination Date, Employee shall not, within the Restricted Area,[1] directly or indirectly (a) solicit any Printing Business[2] from any ColorNet Customer,[3] . . . (b) cause or induce any ColorNet Customer to cease or reduce

---

[1] The Restricted Area is defined in the Nestor Agreement as, "the territory within a fifty (50) mile radius of any ColorNet facility." Ex. A § 2

[2] Printing Business is defined in the Nestor Agreement as, "conventional and digital off-set printing, reprographics and/or other commercial printing products and/or services, including graphic design and wide format trade show and exhibits material."

[3] In the Nestor Agreement, a ColorNet Customer is defined as, "any person or entity (A) with whom Employee had significant communications, contacts, or dealings while employed by ColorNet or Elway, or for whom Employee was ColorNet's or Elway's salesperson, and (B) that purchased any services or products from ColorNet or Elway at any time during the one (1) year period ending on Employee's Termination Date (or to whom ColorNet or Elway had submitted or presented, or was in the process of submitting or presenting, a bid, quote, proposal, or agreement for

its Printing Business with ColorNet, or (c) cause or induce any ColorNet Customer to do any Printing Business with any competitor of ColorNet.

Ex. A § 2.

25.     Finally, the Nestor Agreement prohibited Nestor from soliciting any ColorNet supplier, vendor, licensor, employee, consultant, or contractor for one (1) year after his termination date. Ex. A § 3.

26.     This latter provision is extremely important to ColorNet and the preservation of its business interests and relations, as ColorNet's contractors/vendors have specific knowledge of the requirements of ColorNet's customers. Moreover, ColorNet's contractors/vendors are a substantial source of business to ColorNet, as they direct/encourage customers to use ColorNet.

27.     The Nestor Agreement acknowledged the critical importance of ColorNet's Confidential Information and relationships with its customers and vendors, and provided for injunctive relief, because of the irreparable harm ColorNet would suffer in the event of a breach of any of these necessary protections in the Nestor Agreement. Ex. A § 4.

### Nestor's Tenure with ColorNet

28.     When hired by ColorNet in November 2005, Nestor's title was Customer Service Representative.

29.     During the seven (7) years ColorNet employed Nestor, he progressed from Customer Service Representative to Sales Representative.

30.     As a Sales Representative, Nestor was the face of ColorNet, and was the primary contact for customers wishing to purchase ColorNet products and services.

---

any products and/or services, on Employee's Termination Date or at any time during the preceding thirty days). Certain customers explicitly listed on Exhibit A of the Nestor Agreement were excluded from the definition of "ColorNet Customers."

31.     Nestor's job duties included marketing ColorNet products and services, specifically targeting and pursuing new potential customers, and then selling products and services to prospective and existing ColorNet customers.

32.     Over time, Nestor grew to be a successful sales representative, eventually advancing to become the number two sales representative in the company in 2012.

**Nestor had Full Access to ColorNet's**
**Confidential Information/Trade Secrets as a Sales Representative**

33.     While employed by ColorNet, Nestor was given extensive access to ColorNet's customer lists and contact information, as well as information regarding customers' order history – all of which was maintained on ColorNet's Management Information System ("MI System").

34.     Moreover, Nestor's position required that he develop and provide competitive quotes to customers for the products and/or services which ColorNet was marketing or selling to existing or prospective customers.

35.     Consequently, ColorNet entrusted Nestor with secure login information, so that he could readily access and use ColorNet's MI System, and the confidential information maintained therein.

36.     ColorNet's MI System contains a substantial amount of confidential information, including, but not limited to, customer lists, customer contact information, customer order history, and pricing.

37.     Due to the sensitive nature of the information contained in the MI System, only ten (10) of the approximately twenty-five (25) employees in ColorNet's Virginia office had access to ColorNet's password-protected MI System.

38.     In addition to the information contained on the Ml System, Nestor was an integral part of ColorNet's sales strategy meetings, where ColorNet's senior-level employees discussed confidential marketing and sales strategies, and planned the future strategic direction of the company.

## Nestor Resigns from ColorNet

39.     On February 22, 2013, Nestor submitted a resignation letter to the company's General Manager, Steve Elliott.

40.     In the letter, Nestor resigned from ColorNet, explaining that he had accepted employment with another printing company.

41.     Nestor's letter also acknowledged the existence of the Nestor Agreement. Nestor represented that he would abide by the terms of the Agreement.

42.     In fact, Nestor had requested – and was provided with – a copy of the Nestor Agreement more than two months prior to his resignation, in December 2012.

43.     Upon hearing of Nestor's resignation, ColorNet's Chief Executive Officer and President both requested a meeting with Nestor to ask him to reconsider his decision.

44.     The meeting took place on February 25, 2013.

45.     On February 26, 2013, despite ColorNet's efforts to convince him to stay, Nestor confirmed that his last day of employment with ColorNet would be February 28, 2013.

46.     Thereafter, Nestor remained employed and compensated by ColorNet through and including February 28, 2013.

**Unbeknownst to ColorNet, Good Printers and Nestor Conspire to Solicit
ColorNet's Customers while Nestor is Still Employed by ColorNet**

47.     Upon information and belief, Nestor began searching for employment

opportunities near or before the time he requested a copy of his Agreement in December 2012 –

more than two months before submitting his resignation to ColorNet.

48.     Upon information and belief, Nestor agreed to become employed by Good

Printers shortly thereafter.

49.     After Nestor agreed to become employed by Good Printers, Nestor and Good

Printers conspired to solicit ColorNet's customers and vendors to Good Printers and away from

ColorNet – severing those relationships.

50.     Pursuant to their scheme, Nestor, and Good Printers through Nestor, began

soliciting ColorNet's customers *while Nestor was still employed by ColorNet*.

51.     In furtherance of this scheme, Cynthia Rae Hall, a Prepress Supervisor for Good

Printers, emailed Nestor a link to a Good Printers web portal.

52.     Through this web portal, current ColorNet customers could be directed to upload

documents and files for printing by Good Printers – not ColorNet.

53.     On February 27, 2013, *while still employed and compensated by ColorNet*,

Nestor forwarded the link to the Good Printers web portal to a litany of current ColorNet

customers, soliciting them to upload/transfer their documents – and work – to Good Printers, in

anticipation of Nestor's new employment.

54.     Among the customers and vendors receiving this email was Paul Lucas, who

influenced and directed the business of more than five (5) Federal Credit Unions – each of which

had purchased ColorNet products and services for over a year and a half.

8

55.     These credit unions, collectively, were among ColorNet's top ten (10) most lucrative accounts.

56.     On the very same day (while Nestor was still receiving a paycheck from ColorNet), one of the Federal Credit Unions confirmed that it – at the direction of Nestor – had already uploaded two new projects to Good Printers via the web portal Nestor had provided.

57.     This ColorNet customer also stated in its email that they received confirmation that the two projects were accepted by Good Printers.

58.     On February 27, 2013, Good Printers knew that Nestor remained employed by ColorNet, and further, knew he had executed and was subject to the Nestor Agreement.

59.     Notwithstanding this information, Good Printers knowingly and intentionally provided Nestor with a link to its web portal in order to assist him in his efforts to divert customers and business from ColorNet to Good Printers.

60.     Since February 27, 2013, ColorNet has received very limited – if any – new work from the customers that were directed to the Good Printers' web portal.

61.     As these customers were among ColorNet's best and most consistent customers prior to the scheme and solicitations of Nestor and Good Printers severing these relationships, ColorNet has been irreparably harmed, as well as financially damaged.

### Nestor and Good Printers Conspire to Solicit ColorNet's Contractors while Nestor Remains Employed by Good Printers

62.     In addition to soliciting ColorNet's customers, Nestor and Good Printers also conspired to, and did, solicit ColorNet's contractors.

63.     ***Prior to terminating his employment with ColorNet***, Nestor contacted at least

one ColorNet contract-designer for the purpose of soliciting his work, as well as the customers he

served, away from ColorNet to Good Printers.

64.     Nestor had the designer work on a project for a ColorNet customer.

Nestor then attempted to send this printing project – consisting of the work completed by

ColorNet's contract designer – to Good Printers.

65.     Specifically, on February 28, 2013, Nestor emailed Mattie Nash, a designer

contracted by ColorNet to design a newsletter for Wilderness Presidential Resorts (a ColorNet

customer), from his personal email address.

66.     In his email to Nash, Nestor stated:

> Use only my [personal] email address <davenestor2004@yahoo.com> in the future –
> today is my last day at Colornet [sic] though I plan to stay in the printing business and
> continue doing the newsletter (But PLEASE – say nothing about it that could get back).

(emphasis original).

67.     Upon information and belief, Good Printers conspired with Nestor to divert this

work from ColorNet to Good Printers.

68.     It was only after ColorNet discovered Nestor's communications, and confronted

Nestor about his solicitations, that the Wilderness Presidential Resorts project was returned to

ColorNet.

69.     Upon information and belief, Nestor and Good Printers continue to use

ColorNet's designers to support various projects, including those for solicited ColorNet

customers.

## After Nestor's Employment with ColorNet Terminated,
## Nestor and Good Printers Continue to Solicit ColorNet's Customers and Contractors

70.     Nestor ceased being an employee of – and paid by – ColorNet on March 1, 2013.

71.     Nestor and Good Printers continued their collective efforts to solicit and divert

ColorNet's customers and contractors to Good Printers after Nestor left ColorNet.

72.     For example, on March 1, 2013, Nestor sent an email to Taylor Anderson, of

Capitol Building Supply, located in Manassas Park, Virginia, encouraging the company to

terminate its business relationship with ColorNet in favor of "selecting a new facility to place its

work." Nestor stated he would "suggest" a facility for Capitol Building Supply to place its work.

73.     In this email, Nestor stated:

> I have recently left ColorNet Printing and now represent someone else with comparable
> equipment and services. . . Due to my non-disclosure agreement with them, I am not
> allowed to solicit business from you.  However, if you need help in selecting a new
> facility to place your work, I would be happy to advise you and help in any way possible.
> **I trust that you will treat this e-mail with discretion.**

(emphasis added)

74.     In another example, on March 6, 2013, Shari Connealy of MAGGPIE

Communications, Inc., a ColorNet contractor and broker located in Reston, Virginia, that

ColorNet paid to direct substantial business to ColorNet, informed ColorNet's general manager

that she intended to terminate her relationship with ColorNet in favor of Nestor and Good

Printers.

75.     Despite representations from Nestor that he told Connealy he could not do

business with her due to the Nestor Agreement, in reality, emails between Nestor and Connealy

indicate that the pair had already discussed price quotes for projects *previously in the works*.

76.     At least twelve ColorNet customers – all Nestor accounts – have ceased doing business with ColorNet since Nestor's departure.

77.     ColorNet's gross margin (or profit) from these twelve accounts last year was approximately $356,532.00.

78.     ColorNet had a reasonable expectation to realize a similar gross margin/profit from these customers in 2013 but for Nestor's and Good Printers' efforts to divert this business elsewhere.

79.     ColorNet continues to be damaged by Nestor's and Good Printers' acts every day that profits from ColorNet customers are diverted to Good Printers.

**Count I: Breach of Contract**
**Against Nestor**

80.     ColorNet repeats and re-alleges each and every allegation in the preceding Paragraphs 1-79 as if set forth herein, unless inconsistent herewith.

81.     Nestor entered into a binding confidentiality agreement with ColorNet – the Nestor Agreement.

82.     The Nestor Agreement prohibited Nestor from, among other things: (i) disclosing ColorNet's Confidential Information; (ii) causing ColorNet customers to terminate their relationship with ColorNet; and (iii) soliciting ColorNet contractors to do business with other companies.

83.     Nestor breached this Agreement, both *while still employed by and receiving compensation from ColorNet*, and after leaving his employment with ColorNet, by: (i) using Confidential Information and trade secrets Nestor obtained as a ColorNet employee to cause ColorNet customers and contractors to terminate their relationships with ColorNet in favor of

Good Printers or others; (ii) causing ColorNet customers to terminate their relationship with ColorNet and move their business to Good Printers or others; and (iii) soliciting ColorNet contractors (including designers and brokers) away from ColorNet to Good Printers or others.[4]

84.      ColorNet has already suffered significant financial damages as a result of Nestor's breach of the Nestor Agreement.

85.      ColorNet will continue to suffer financial damage, as well as other irreparable harm, including the loss of goodwill and damage to its customer and contractor relationships, and the loss of future business, if Nestor is permitted to continue engaging in the wrongful conduct described and to derive any direct or indirect financial benefits arising from this conduct.

86.      ColorNet is entitled to an award of compensatory damages and injunctive relief enjoining Nestor from continuing his wrongful activities.

**Count II: Tortious Interference with Contract**
**Against Good Printers**

87.      ColorNet repeats and re-alleges each and every allegation in the preceding Paragraphs 1-86 as if set forth herein, unless inconsistent herewith.

88.      ColorNet entered into a valid and legally binding confidentiality agreement with Nestor – the Nestor Agreement.

89.      Good Printers was aware of the existence of the Nestor Agreement, as well as its terms.

90.      Good Printers willfully and intentionally encouraged Nestor, and provided Nestor with a mechanism – and ample means – to solicit ColorNet's customers and contractors, and to

---

[4] Nestor's efforts to sever these customer, contractor, and vendor relationships, whether by diverting them to Good Printers or elsewhere, was equally damaging to ColorNet.  Moreover, Nestor knew that severing these relationships would create business/financial opportunities for him/Good Printers either now or in the future.

divert business from ColorNet to Good Printers, knowing that such actions would result in the breach of the Nestor Agreement.

91.     Good Printers engaged in these activities while Nestor remained employed by and was receiving compensation from ColorNet, as well as after Nestor resigned from ColorNet.

92.     At a bare minimum, Good Printers knew that as a result of its actions, the breach of the Nestor Agreement was substantially certain to occur.

93.     As a result of Good Printers' actions, Nestor did breach his agreement with ColorNet, causing damage to ColorNet's business.

94.     ColorNet is entitled to an award of compensatory damages for the harm suffered as a result of this wrongful conduct.

95.     Good Printers should also be disgorged of any profits received by Good Printers as a result of its actions or Nestor's actions.

96.     ColorNet is entitled to an award of punitive damages because Good Printers acted willfully, in conscious disregard of ColorNet's rights.

97.     ColorNet will continue to suffer financial damage, as well as other irreparable harm, including the loss of goodwill and damage to its customer and contractor relationships, and the loss of future business, if Good Printers is permitted to continue engaging in the wrongful conduct described. Therefore, ColorNet is also entitled to injunctive relief enjoining any further wrongful conduct by Good Printers.

**Count III: Breach of Fiduciary Duty and Duty of Loyalty**
**Against Nestor and Good Printers**

98.     ColorNet repeats and re-alleges each and every allegation in the preceding Paragraphs 1-97 as if set forth herein, unless inconsistent herewith.

99.     During his employment with ColorNet, Nestor had a fiduciary duty to exercise the utmost good faith and loyalty to ColorNet and to act in the best interests of ColorNet.

100.     Nestor owed a duty of loyalty to ColorNet, which prohibited him from diverting business from, or competing with, ColorNet during his term of employment, and required him to place ColorNet's interests above his own personal and professional interests.

101.     While still employed by ColorNet, Nestor breached the fiduciary duty and duty of loyalty he owed to ColorNet by: (i) misappropriating ColorNet's trade secrets and other confidential information for the benefit of himself and Good Printers; (ii) causing ColorNet's Customers to terminate their relationship with ColorNet, in favor of beginning a relationship with Good Printers; (iii) causing ColorNet's contractors, including designers and brokers, to terminate their relationship with ColorNet and to begin a relationship with Good Printers; (iv) diverting ColorNet's business and profits to Good Printers' and his (Nestor's) pocket; and (v) engaging in the other wrongful conduct described above.

102.     Moreover, Good Printers: (i) knew of and encouraged Nestor's breach of his fiduciary duty to ColorNet; (ii) aided and facilitated in Nestor's breach of his fiduciary duty by providing Nestor with the means to seamlessly divert ColorNet's business and customers to Good Printers; and (iii) benefited from Nestor's breach of fiduciary duty by accepting payment from the ColorNet customers diverted to Good Printers and generating revenue and profits from such projects.

103.     Therefore, Good Printers is jointly liable to ColorNet for breach of fiduciary duty.

104.     ColorNet is entitled to an award of compensatory damages for the harm suffered as a result of Nestor's and Good Printers' wrongful conduct, including but not limited to the disgorgement of any compensation received by Nestor and Good Printers as a result of their

wrongful conduct, the disgorgement of any compensation received by Nestor from ColorNet while engaging in his wrongful conduct, and the disgorgement of any net revenue or profits realized by Good Printers as a result of its wrongful conduct.

105.    ColorNet is also entitled to an award of punitive damages because Nestor and Good Printers acted willfully, and in conscious disregard of ColorNet's rights.

### Count IV: Aiding and Abetting
### Breach of Fiduciary Duty and Duty of Loyalty
### Alternative to Count III as to Good Printers

106.    ColorNet repeats and re-alleges each and every allegation in the preceding Paragraphs 1-105 as if set forth herein, unless inconsistent herewith.

107.    During his employment with ColorNet, Nestor had a fiduciary duty to exercise the utmost good faith and loyalty to ColorNet and to act in the best interests of ColorNet.

108.    Nestor owed a duty of loyalty to ColorNet, which prohibited him from diverting business from, or competing with, ColorNet during his term of employment, and required him to place ColorNet's interests above his own personal and professional interests.

109.    While still employed by ColorNet, Nestor breached the fiduciary duty and duty of loyalty he owed to ColorNet by: (i) misappropriating ColorNet's trade secrets and other confidential information for the benefit of himself and Good Printers; (ii) causing ColorNet's Customers to terminate their relationship with ColorNet, in favor of beginning a relationship with Good Printers; (iii) causing ColorNet's contractors, including designers and brokers, to terminate their relationship with ColorNet and to begin a relationship with Good Printers; (iv) diverting ColorNet's business and profits to Good Printers' and his (Nestor's) pocket; and (v) engaging in the other wrongful conduct described above.

110.    Moreover, Good Printers: (i) knew of and encouraged Nestor's breach of his fiduciary duty to ColorNet; (ii) aided and facilitated in Nestor's breach of his fiduciary duty by providing Nestor with the means to seamlessly divert ColorNet's business and customers to Good Printers; and (iii) benefited from Nestor's breach of fiduciary duty by accepting payment from the ColorNet customers diverted to Good Printers and generating revenue and profits from such projects.

111.    ColorNet is entitled to an award of compensatory damages for the harm suffered as a result of Good Printers' wrongful conduct, including but not limited to the disgorgement of any net revenue and profits received by Good Printers as a result of its wrongful conduct.

112.    ColorNet is also entitled to an award of punitive damages because Good Printers acted willfully, in conscious disregard of ColorNet's rights.

### Count V: Misappropriation of Trade Secrets
### Pursuant to Va. Code Ann. §§ 59.1-336, et seq.
### Against Nestor and Good Printers

113.    ColorNet repeats and re-alleges each and every allegation in the preceding Paragraphs 1-112 as if set forth herein, unless inconsistent herewith.

114.    Nestor had access to ColorNet's trade secrets, including, inter alia, information derived by Nestor from ColorNet's secure MI System, such as customer lists, customer contact information, pricing information, and customer order information, as well as other information Nestor learned as a senior employee of ColorNet.

115.    The Defendants used these ColorNet trade secrets, without ColorNet's express or implied consent, to pursue business relationships with ColorNet's customers, prospective customers and industry partners.

116. ColorNet undertakes reasonable efforts with both its employees and business partners to preserve the confidentiality of its trade secrets.

117. For example, all of ColorNet's sales staff members, including Nestor, are required to enter into confidentiality agreements.

118. In addition, most of these trade secrets are stored on ColorNet's MI System, a secure, password-protected electronic medium.

119. Pursuant to the terms of the Nestor Agreement, Nestor had a duty to maintain the confidentiality of, and to limit his use of, ColorNet's trade secrets.

120. The Defendants' use of ColorNet's trade secrets under the circumstances alleged above constitutes misappropriation in violation of Va. Code Ann. §§ 59.1-336, et seq.

121. ColorNet will continue to suffer financial damage, as well as other irreparable harm, including the loss of goodwill and damage to its customer and contractor relationships, and the loss of future business, if Defendants are permitted to continue engaging in the wrongful conduct described. Therefore, ColorNet is also entitled injunctive relief enjoining any further wrongful conduct by the Defendants.

122. Pursuant to Va. Code Ann. § 59.1-338(A), ColorNet is also entitled to an award of damages to include its actual loss caused by Defendants' misappropriation, as well as Defendants' unjust enrichment as a result of the misappropriation.

123. Defendants acted in conscious disregard of ColorNet's contractual and common law rights, and with the purpose of depriving ColorNet of lucrative business opportunities.

124. Therefore, Defendants' misappropriation of ColorNet's trade secrets constitutes willful and malicious conduct that warrants an award of punitive damages and ColorNet's attorneys' fees incurred in this action, pursuant to Va. Code Ann. §§ 59.1-338(B) and 59.1-338.1.

### Count VI: Conspiracy to Injure ColorNet's Business
### Pursuant to Va. Code Ann. §§ 18.2-499 & 18.2-500
### Against Nestor and Good Printers

125.    ColorNet repeats and re-alleges each and every allegation in the preceding Paragraphs 1-124 as if set forth herein, unless inconsistent herewith.

126.    Defendants conspired with one another for the purpose of willfully and maliciously injuring ColorNet's business.

127.    Defendants acted with the express purposes of misappropriating ColorNet's trade secrets and other proprietary information, to divert ColorNet's customers and business to Good Printers.

128.    The scheme was formed, and the conspiring Defendants began taking action in furtherance of the scheme while Nestor was still an employee of ColorNet.

129.    Defendants acted intentionally, purposefully, and without lawful justification.

130.    Defendants' conduct caused injury to ColorNet's business, including but not limited to lost profits, future business expectancies, and goodwill.

131.    ColorNet is entitled to recover three-fold the damages it sustained as a result of Defendants' wrongful conduct, as well as its costs of suit and reasonable attorneys' fees incurred in this case.

132.    ColorNet is also entitled to an award of punitive damages because Defendants acted willfully, in conscious disregard of ColorNet's legal rights and interests.

133.    ColorNet will continue to suffer financial damage, as well as other irreparable harm, including the loss of goodwill and damage to its customer and contractor relationships, and the loss of future business, if Defendants are permitted to continue engaging in the wrongful

conduct described.  Therefore, ColorNet is also entitled to injunctive relief in the form of an

order prohibiting such further wrongful conduct by the Defendants.

**Count VII: Common Law Civil Conspiracy**
**Against Nestor and Good Printers**

134.    ColorNet repeats and re-alleges each and every allegation in the preceding

Paragraphs 1-133 as if set forth herein, unless inconsistent herewith.

135.    Defendants conspired with one another for the purpose of willfully and

maliciously injuring ColorNet's business, and interfering with ColorNet's business relationships

with its customers.

136.    Defendants acted with the express purposes of misappropriating ColorNet's trade

secrets and other proprietary information, to divert ColorNet's customers and business to Good

Printers.

137.    The scheme was formed, and the conspiring Defendants began taking action in

furtherance of the scheme while Nestor was still an employee of ColorNet.

138.    Defendants acted intentionally, purposefully, and without lawful justification.

139.    Defendants' conduct caused injury to ColorNet's business, including but not

limited to, lost profits, future business expectancies, and goodwill.

140.    ColorNet is entitled to an award of compensatory damages for the harm suffered

as a result of Nestor's and Good Printers' wrongful conduct, including but not limited to, the

disgorgement of any compensation received by Nestor and Good Printers as a result of their

wrongful conduct.

141.    ColorNet is also entitled to an award of punitive damages because Defendants

acted willfully, in conscious disregard of ColorNet's rights.

20

142.    ColorNet will continue to suffer financial damage, as well as other irreparable

harm, including the loss of goodwill and damage to its customer and contractor relationships, and

the loss of future business, if Defendants are permitted to continue engaging in the wrongful

conduct described. Therefore, ColorNet is also entitled to injunctive relief in the form of an

order prohibiting such further wrongful conduct by the Defendants.

**Count VIII: Tortious Interference with Business Relations**
**Against Nestor and Good Printers**

143.    ColorNet repeats and re-alleges each and every allegation in the preceding

Paragraphs 1-142 as if set forth herein, unless inconsistent herewith.

144.    ColorNet had ongoing and profitable business relationships with the customers

and contractors Nestor and Good Printers wrongfully diverted from ColorNet to Good Printers or

elsewhere.

145.    ColorNet profited and reasonability expected to continue profiting from the

ongoing business relationships it maintained with its customers and contractors.

146.    Nestor and Good Printers knew of ColorNet's business relationships, as well as

ColorNet's reasonable expectancy of receiving profits from its relationship with these customers,

when they took steps to sever these relationships by diverting these customers from ColorNet to

Good Printers or elsewhere.

147.    Nestor and Good Printers acted intentionally, with the express purpose and intent

of misappropriating ColorNet's trade secrets and other proprietary information, and in breach of

Nestor's Agreement and Fiduciary Duty, in order to divert ColorNet's customers, and

corresponding business (and revenues) to Good Printers.

148.     As a direct result of Defendants' intentional wrongful conduct, many of ColorNet's customers terminated their business relationships with ColorNet.

149.     Absent the Defendants' conduct, ColorNet could have reasonably expected these customers to continue their business relationship with ColorNet, and to realize substantial, continuing profits from this business.

150.     Defendants' conduct caused injury to ColorNet's business, including but not limited to, lost profits, future business expectancies, and goodwill.

151.     ColorNet is entitled to an award of compensatory damages for the harm suffered as a result of Nestor's and Good Printers' wrongful conduct, including but not limited to, the disgorgement of any compensation received by Nestor and Good Printers as a result of their wrongful conduct.

152.     ColorNet is also entitled to an award of punitive damages because Defendants acted willfully, in conscious disregard of ColorNet's rights.

153.     ColorNet will continue to suffer financial damage, as well as other irreparable harm, including the loss of goodwill and damage to its customer and contractor relationships, and the loss of future business, if Defendants are permitted to continue engaging in the wrongful conduct described.  Therefore, ColorNet is also entitled injunctive relief enjoining any further wrongful conduct by the Defendants.

WHEREFORE, ColorNet requests that this Court enter judgment in their favor on all

counts, and to enter an order granting it the following relief:

**Count I:**      **Breach of the Contract**

     (a)    An award of compensatory damages against Nestor in an amount to be determined at trial, but in no event less than $356,532.00;

     (b)    Punitive damages in an amount to be determined at trial; and

     (c)    Injunctive relief, enjoining Nestor's wrongful conduct.

**Count II:**     **Tortious Interference with Contract (Nestor Agreement)**

     (a)    An award of compensatory damages against Good Printers in an amount to be determined at trial, but in no case less than $356,532.00;

     (b)    Punitive damages in an amount to be determined at trial; and

     (c)    Injunctive relief, enjoining Good Printers' wrongful conduct.

**Count III:**    **Breach of Fiduciary Duty and Duty of Loyalty**

     (a)    An award of compensatory damages against Nestor and Good Printers, in an amount to be determined at trial, but in no case less than $356,532.00; and

     (b)    An award of punitive damages against Nestor and Good Printers.

**Count IV:**     **Aiding and Abetting Breach of Fiduciary Duty and Duty of Loyalty**
(alternative to Count III as to Good Printers)

     (a)    An award of compensatory damages against Good Printers, in an amount to be determined at trial, but in no case less than $356,532.00; and

     (b)    An award of punitive damages against Good Printers.

**Count V:**      **Misappropriation of Trade Secrets**

     (a)    An award of damages against Nestor and Good Printers, pursuant to Va. Code Ann. § 59.1-338(A), in an amount to be determined at trial;

     (c)    An award of punitive damages against Nestor and Good Printers, pursuant to Va. Code Ann. § 59.1-338(B);

     (d)    An award of Plaintiff's attorneys' fees against Nestor and Good Printers, pursuant to Va. Code Ann. § 59.1-338.1; and

     (e)    Injunctive relief enjoining Nestor's and Good Printers' wrongful conduct;

**Count VI:**   **Conspiracy to Injure ColorNet's Business in Violation of Va. Code Ann. § 18.2-499; § 18.2-500**

(a)   An award of treble damages against Nestor and Good Printers pursuant to Va. Code Ann. § 18.2-500, in an amount to be determined at trial;

(b)   ColorNet's costs of suit and attorneys' fees against Nestor and Good Printers, pursuant to Va. Code Ann. § 18.2-500; and

(c)   Injunctive relief, enjoining Nestor's and Good Printers' wrongful conduct.

**Count VII:**   **Common Law Civil Conspiracy**

(a)   An award of compensatory damages against Nestor and Good Printers, in an amount to be determined at trial, but in no case less than $356,532.00;

(b)   An award of punitive damages against Nestor and Good Printers; and

(c)   Injunctive relief, enjoining Nestor's and Good Printers' wrongful conduct.

**Count VIII:**   **Tortious Interference with Business Relations**

(a)   An award of compensatory damages against Nestor and Good Printers, in an amount to be determined at trial, but in no case less than $356,532.00;

(b)   An award of punitive damages against Nestor and Good Printers; and

(c)   Injunctive relief, enjoining Nestor's and Good Printers' wrongful conduct.

An award of any and all other relief this Court deems just and warranted.

Respectfully submitted,

SHULMAN, ROGERS, GANDAL,
    PORDY & ECKER, P.A.

By:_____
Gregory D. Grant (Bar No. 31784)
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Telephone: (301) 230-5200 or
            (703) 684-5200
Facsimile: (301) 230-2891
ggrant@shulmanrogers.com

*Counsel for Plaintiff*
*ColorNet Printing and Graphics, Inc.*